Matter of Collin Q. (James R.) (2019 NY Slip Op 08897)





Matter of Collin Q. (James R.)


2019 NY Slip Op 08897


Decided on December 12, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 12, 2019

526414

[*1]In the Matter of Collin Q., a Permanently Neglected Child. Delaware County Department of Social Services, Petitioner; James R., Respondent. Renard KK. et al., Appellants. Attorney for the Child, Appellant.

Calendar Date: October 18, 2019

Before: Egan Jr., J.P., Lynch, Clark and Pritzker, JJ.


Carly Walas, Walton, for Renard KK. and another, appellants.
Joseph Cahill, Summit, attorney for the child, appellant.
Victor B. Carrascoso, Cooperstown, for respondent.



Lynch, J.
Appeal from an order of the Family Court of Delaware County (Lambert, J.), entered February 27, 2018, which, in a proceeding pursuant to Social Services Law § 384-b, denied petitioner's motion to revoke a suspended judgment, and discharged the child to respondent.
Respondent is the father of the subject child (born in 2013). In November 2013, the child's mother agreed to place the child in petitioner's care.[FN1] Respondent took a paternity test in November 2014 and learned that he was the child's father. He later petitioned for custody and, in June 2015, petitioner began facilitating visitation between respondent and the child.
Petitioner thereafter commenced this permanent neglect proceeding against respondent. In July 2016, respondent stipulated to a finding that he failed to plan for the child's future because he "failed to assert his parental rights and/or make any effort to get [the child] out of foster care" for the one-year period prior to November 2014, despite knowing that the child's mother was pregnant and that the child was born approximately nine months after the two had been in a sexual relationship. Family Court issued a one-year suspended judgment instead of terminating respondent's parental rights. In July 2017, petitioner moved to revoke the suspended judgment and to terminate respondent's parental rights, and respondent opposed the motion and sought to terminate the guardianship proceeding and discharge the child to his custody. Following a hearing, Family Court denied petitioner's motion, finding that respondent had complied with the terms of the suspended judgment and discharged the child to respondent's custody. The attorney for the child and the foster parents appeal.
The purpose of a suspended judgment is to "provide[] a parent, previously found to have permanently neglected his or her chil[d], with a brief grace period within which to become a fit parent with whom the chil[d] can be safely reunited" (Matter of Nahlaya MM. [Britian MM.], 172 AD3d 1482, 1483 [2019]). In seeking the revocation of a suspended judgment, petitioner must establish the "parent's noncompliance with the terms of the suspended judgment during this grace period . . . by a preponderance of the evidence" (Matter of Joseph QQ. [Karissa RR.], 161 AD3d 1252, 1252 [2018], lv denied 31 NY3d 912 [2018]). A suspended judgment may be revoked — even where there is "literal compliance" with its terms — if the parent is unable to "show that progress has been made to overcome the specific problems which led to the removal of the child[]" (Matter of Maykayla FF. [Eugene FF.], 141 AD3d 898, 898 [2016] [internal quotation marks, brackets and citations omitted]). We give great deference to and will not disturb Family Court's findings as long as they are supported by a sound and substantial basis in the record (see Matter of Nahlaya MM. [Britian MM.], 172 AD3d at 1483).
The terms of the suspended judgment required the father to, among other things, maintain communication and contact with the child, participate and cooperate with petitioner in planning for the child and in strengthening his bond with the child, obtain appropriate housing, refrain from alcohol and substance abuse, notify petitioner of changes in his residence and employment, and cooperate with petitioner and allow access to his residence. When the suspended judgment was issued, respondent was 38 years old, attending college studying for a degree in construction management and working part time. Respondent had been taking Suboxone for approximately four years under the supervision of a doctor after he became addicted to opiates following a back injury. Respondent was in a relationship and residing in a mobile home with a woman (hereinafter the ex-fiancÉe), who had two children of her own.
In support of its claim that respondent violated the terms of the suspended judgment, petitioner primarily argued that respondent missed scheduled visits with the child and meetings with his caseworker, missed unscheduled drug testing, failed to obtain suitable housing, moved without informing petitioner and did not maintain contact with the child. At the hearing, petitioner's caseworker testified that, during the grace period, respondent missed two casework contacts, two home visits and two to three visits with the child. The caseworker acknowledged, however, that he often texted with respondent, that he had initially allowed casework contacts and home visits to be rescheduled and that it was possible that his case notes did not record all the communications that he had with respondent during the relevant time period.
As for respondent's failure to provide a suitable home for the child, because respondent's ex-fiancÉe stopped cooperating with petitioner, all agreed that it was not appropriate for the child to have contact with her. The caseworker testified that, although respondent claimed that the ex-fiancÉe was moving, the two continued to reside together and therefore overnight visitation with the child was never approved. Respondent conceded that it took longer than expected to separate from the ex-fiancÉe, but explained that neither had the financial resources to find independent housing. In addition, respondent and the ex-fiancÉe testified that petitioner initially permitted an arrangement where the ex-fiancÉe and her children would leave the mobile home to stay with a friend while the child was with respondent. According to respondent, in December 2016, petitioner advised that this arrangement would no longer work and overnight visitation was never approved.
Respondent finally moved out of the mobile home that he shared with the ex-fiancÉe in June 2017, when he left Delaware County to accept a paid summer internship with a national construction management firm at a job located in the City of Poughkeepsie, Dutchess County. Although petitioner's caseworker testified that respondent did not advise petitioner in advance that he was going, the case management notes indicate that it was discussed. The caseworker recalled, however, that there was an attempt to schedule a home visit in Poughkeepsie that never came to fruition. For his part, respondent testified that he did tell the caseworker about the internship because he was excited about the opportunity.
In our view, Family Court properly determined that petitioner failed to prove by a preponderance of the evidence that respondent violated the terms of the suspended judgment. Accepting as true that respondent occasionally missed contacts or visits, the court, with its ability to observe the witnesses, was within its authority to credit the testimony that respondent communicated to his caseworker in advance when he was running late or unable to attend (see Matter of Donte LL. [Crystal LL.], 141 AD3d 907, 908 [2016]). Moreover, the evidence demonstrated that, initially, petitioner permitted visits and contacts to be rescheduled. As for the missed drug and alcohol screens, there was similar evidence that respondent was permitted to reschedule tests on the few occasions that he was unable to provide a sample. It is notable that the caseworker's notes indicate that, throughout the grace period, there was never a concern with respondent's drug or alcohol use. Finally, although petitioner contends that respondent failed to maintain contact with the child, respondent claims that he was never provided a telephone number, and the foster parents confirmed that he had provided an email address for communication. Given the child's age and the foster parents' "affirmative obligation . . . to solidify the relationship between biological parent and child" (Matter of Michael B., 80 NY2d 299, 309-310 [1992]), we discern no willful violation in this regard.
Like Family Court, we find that respondent substantially complied with the terms of the suspended judgment. When the suspended judgment was issued, respondent — who had been estranged from the child's mother for years — had only just become aware that he was the child's father. It is not disputed that respondent attended all required mental health and drug and alcohol evaluations and parenting classes as directed. Two parent educators testified that they observed respondent and the child together, that respondent was engaging and appropriate with the child, the child was happy and excited to be with respondent and the two were bonded and shared a positive relationship. At the time of the hearing, respondent was within a month of earning his college degree, was working as a construction supervisor, had separated from the ex-fiancÉe and was living alone in an apartment with a room for the child. Under the circumstances, respondent demonstrated both a "genuine effort[]" to comply with the terms of the suspended judgment (Matter of Nahlaya MM. [Britian MM.], 172 AD3d at 1484) and significant "progress . . . to overcome the specific problems which led to the [suspended judgment]" (Matter of Maykayla FF. [Eugene FF.], 141 AD3d at 898 [internal quotation marks, brackets and citations omitted]).
We further find that Family Court properly determined that the child's best interests — a consideration "relevant at all stages of a permanent neglect proceeding" (Matter of Cecilia P. [Carlenna Q.], 163 AD3d 1095, 1096 [2018] [internal quotation marks and citation omitted]) — would be fostered by discharging the child to respondent. The foster parents and the attorney for the child contend that the court gave excessive weight to a court-ordered forensic evaluation completed in June 2017. Although the court's determination was consistent with the forensic evaluator's conclusion, we do not agree that the court abdicated its decision-making authority. The forensic evaluator's report noted, among other things, that the foster parents "infantilized" the child. For example, at nearly five years old, the child was not potty trained, used a pacifier, slept in a crib and was reportedly fed by hand in a high chair. When asked why the child still wore a diaper, the foster father explained that, "essentially we're dealing with damaged goods here and we're . . . not forcing [the child] to do anything because if he gets forced to do anything he typically acts out afterwards." We find this explanation to be extremely inappropriate. The foster parents' adult daughter — the child's primary caretaker — disputed some of the infantilization claims during her testimony. The parent educators confirmed, however, that the child would be carried to supervised visits by the foster parents' adult daughter, that she encouraged the child to use the pacifier during the visits and that she discouraged the child from helping pick up prior to the conclusion of visits. The foster father claimed that the child frequently returned home from unsupervised visits with a full, wet diaper, and there was testimony by the foster parents' adult daughter and the foster father that the child was demonstrably anxious after visits with respondent and tore at his fingernails, pressed his hands against his mouth and suffered "explosive diarrhea." The parent educators who transported the child to and from visits directly contradicted this testimony and recalled that the child was excited and happy to spend time with respondent.
We find no indication in the record that Family Court attempted to limit testimony regarding the child's best interests (compare Matter of Amber AA., 301 AD2d 694, 698 [2003]). Rather, during the four-day hearing, there was ample testimony by the foster father, the foster parents' adult daughter, respondent, multiple caseworkers, parent educators and the forensic evaluator (compare Matter of Nahlaya MM. [Britian MM.], 172 AD3d at 1485; Matter of Cecilia P. [Carlenna Q.], 163 AD3d at 1096-1097). In our view, the evidence supported the court's conclusion that there was an "extremely positive" bond between respondent and the child that was "psychologically beneficial" to the child. It follows that the court's determination to discharge the child to respondent's custody in accordance with a graduated schedule was supported by a sound and substantial basis in the record.
Egan Jr., J.P., Clark and Pritzker, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The mother surrendered her parental rights in October 2016.